BROWN v. CAROLINA MIDLAND RY. CO.

1. RAILROADS—COMMUNICATED FIRES—NONSUIT.—In an action against a railroad company for damages caused by fire communicated from its right of way, it is improper to grant nonsuit, where there is evidence tending to show that the authorized agent of the defendant made a fire in the stove and went away and left it red hot; that there was no water in the exhaust pipes, which seemed to have been defective; that stove pipe was so constructed as to make it liable to set wood

parts on fire, and went through roof; that fire was first seen on roof of depot and was communicated from there to destroyed property.

2. REHEARING refused.

Before HUDSON, special Judge, Barnwell, May, 1901. Reversed.

Action by Jennie Brown against Carolina Midland Ry. Co. From order granting nonsuit, plaintiff appeals.

*Messrs. Davis & Best, R. C. Holman, J. O. Patterson* and *W. A. Holman,* for appellant.

*Messrs. Davis & Best* cite: *The facts proved showing the probable cause of the fire to be the defective stove pipe, &c., make up a case for jury:* 56 S. C., 398; 12 Am. R., 659; 13 Am. St. R., 221; 13 Ency., 511.

*Mr. J. O. Patterson* cites: *If there is any testimony, the force and effect of which must be determined, the case should be submitted to the jury:* 19 S. C., 23; 16 S. C., 397; 59 S. C., 429.

*Messrs. Robert Aldrich* and *Izlar Bros.,* contra, cite: *There are two distinct causes of action, one under the statute and one under the common law:* 43 S. C., 225. *As to what must be shown to make out cause of action under statute:* 31 S. C., 378; 21 S. C., 94. *Fact that fire had caught from stove before, can throw no light on this:* 24 S. C., 366. *As to the law of nonsuit:* 19 S. C., 510; 21 S. C., 93. *As to the general doctrine of liability for communicated fires:* 50 Am. R., 71; Watson on Dam. for Per. Inj., secs. 37, 38.

The opinion in this case was filed June 17, 1902, but remittitur held up on petiton for rehearing until

July 5, 1902. The opinion of the Court was delivered by MR. JUSTICE GARY. This appeal raises the question

whether his Honor, the Circuit Judge, erred in granting a nonsuit on the ground that there was no testimony whatever tending to show that the fire described in the complaint originated within the limits of the right of way of said road, in consequence of the act of any of its authorized agents or employees. The 4th, 5th and 6th paragraphs of the complaint are as follows: "4. That on the night of the 10th or the early morning of the 11th (about 1 o'clock a. m.) of January, A. D. 1899, as hereinbefore alleged, the defendant corporation, whose depot was situated on its right of way near its line of road, and the plaintiff's buildings and other property as aforesaid, being situated a like distance therefrom (to wit: five or six feet), allowed fire to remain in or so near said depot building that the same caught or took fire, communicated same to plaintiff's buildings, as hereinbefore alleged, completely destroying them, together with the corn mill outfit, cylindrical cotton press outfit, cotton ginnery, gins, feeders, condensers, fans, shaftings, conveyors and pulleys. That said fire also destroyed the cotton, corn, cotton seed, cans and cases, engines and boilers, shaftings and pulleys, and each and every article as enumerated in the third paragraph of this complaint. 5. That among other things it was the duty of the defendant company to retain a night watchman at and around said depot (at night) to prevent just such conflagrations as herein complained of, which they failed (negligently) so to do. 6. That said fire would not have occurred but for defendant's carelessness and negligence in allowing same to remain in their stove or heater in said depot and other fire to remain near or about said depot; and the plaintiff further charges that said defendant allowed a box car to stand between their depot and plaintiff's buildings in a dangerous condition, to wit: a hot box being thereto attached; all of which facts were well known, or should have been known, to said defendant, and by reason of the aforesaid facts the defendant has damaged the plaintiff $10,000."

The answer, among other things, contained a general de-

nial, which put in issue the allegation that the fire originated within the limits of the right of way of said road in consequence of the acts of its authorized agents or employees. Sec. 1698 of the Revised Statutes is as follows: "Every railroad corporation shall be responsible in damages to any person or corporation whose buildings or other property may be injured by fire communicated by its locomotive engines or originating within the limits of the right of way of said road, in consequence of the act of any of its authorized agents or employees, except in any case where property shall have been placed on the right of way of such corporation unlawfully or without its consent, and it shall have an insurable interest in the property upon its route for which it may be so held responsible, and may procure insurance in its own behalf."

W. A. Wright testifies as follows: "Did you see the fire that occurred in January of that year at the Carolina Midland depot? Yes, sir. Where were you when you saw that fire? In my bed room. How far? About two hundred yards. Is that the nearest residence to that depot? Yes, sir. Where did you first see the fire? On top of the roof; the fire appeared to be about the middle of the roof. Was there anything else burning? Soon after the top of the car boxes caught from the falling cinders. Was Mr. Brown's ginnery burning? No, sir, none of that part on fire. Did they catch while you were there? Yes, sir. Was there any fire on the lower part of the depot? No, sir; the fire threw a great deal of light in my room, and when I got up I ran to the window on this side next to the depot where the fire was and threw the window up, and there was no fire on the lower part of the depot at all."

G. M. Green testified as follows: "Where were you when this fire caught? I was asleep, and was aroused by one of my children which was sleeping on the east side and I was on the west side of the house, and I went out on my back piazza and saw the fire, and it seemed as if it was burning in the south end of the depot. Please indicate where you

think that fire was on that building? My recollection is that it was burning about the second story part of the building, I could not— Did you go over there? I dressed as quick as I could and went over there; when I got there I found the depot burning, and the platform caught immediately after I got there. Were any box cars on that side? I think there were two or three, there were some, but I don't know where they were. Well, give us an idea about where they were? I know they were between this building, but can't locate them exactly. Are you familiar with the construction of this depot building? Yes, sir. How was it constructed? The offices that were occupied by the agent and waiting rooms were on the first floor. How was the building heated? It was heated by a heater. Where was the heater? It was down stairs in the room of the agent. How did the pipes go out of there? They went out in a coil. How did the pipes get out of the building? Well, I would not like to explain that, for I can't remember it. Give us an idea? My recollection is that it went out through a stove pipe. At an up story of the building? Yes, sir. Did you ever have an office in that building? Yes, sir. * * * You stated that when you got there this depot was on fire, and afterwards Mrs. Brown's houses and ginnery caught? Yes, sir. These cars were burning about the same time?"

John Eaves testified as follows: "Please tell us how that stove pipe went up through there? It was a stove pipe going through the ceiling, with two little tin collars that were conductors of heat sufficient to pass the piping through, and then on the flue of the second story, and from there to the top of the roof, which had a double case facing with little holes in it for ventilation, and which had from the first story and the story of the second a two and one-half inch pipe touching it, and when coming in contact with the wooden structure was liable to set it on fire, that it was attached to. How close to the wood work was it? It was fastened to it. What was the ability for the fire to heat this outside piping that was nailed on the wood, if it could be done? It had all

24—64

the chances; a stove pipe from a stove will often times get red hot, and there being an iron collar and that would become as hot as the pipe. What kind of a stove did they have? An upright coal stove. Where was the stove situated? In the freight agent's office, down stairs on the first floor. How did the piping run from the stove? Perfectly straight, through the overhead ceiling on the first floor and up through the roof."

Anthony Ingram testified as follows: "Do you remember the night of this alleged fire? Yes, sir. Did you do any work on that night? Yes, sir. Down where? To the Southern depot. What position did you hold down there— what were your duties around the depot? I delivered freight. Anything else? Made fires, kept fires, delivered freight, gave out freight and attended to the lamps. What time did you leave there? I left there about 11 o'clock with Mr. Hammett. Do you remember what condition you left the heater in? It had been raining and we left a fire in there. What kind of a fire? A coal fire. Was it a small fire or a large one? It was a pretty good fire—it was red hot; I made a fire about half-past 8. What did you burn in that heater? Coal. What time did the train come? It was due there about 9 o'clock—9.20—and did not get there until 9.30. Do you know what condition that heater pipe was in? Down below it was in a pretty bad fix, because it was burnt out. Was there anything else that you know? Well, what we call exhaust pipes to hold hot water; I never saw any in them; I made a fire, and the way those things are situated up stairs, they cannot hold water. Did I understand you to say you made the fire and you did not have water in them? Yes, sir. Do you know how close the wood work was to the burnt place? I suppose it was about a half a foot. Was that up stairs? Yes, sir; they had some cotton there."

There was no positive testimony that the fire originated within the limits of the right of way of the defendant in consequence of the acts of any of its authorized agents or employees; nevertheless, the nonsuit was not proper, if the

circumstances detailed in evidence tended to show that the fire originated as alleged. The testimony showed that an authorized employee of the defendant made a fire in the stove about half-past 8 o'clock; that there was a good fire in the stove, and it was red hot when he left, about 11 o'clock; that there was no water in the exhaust pipes, which seem to have been defective; that the stove pipe was so constructed as to make it liable to set the wooden structure on fire; that the stove pipe went through the roof of the building, and there is where the fire was first discovered. These and other circumstances appearing in evidence satisfy us that his Honor, the Circuit Judge, erred in not submitting the case to the jury.

It is the judgment of this Court, that the judgment of the Circuit Court be reversed, and that the case be remanded for a new trial.

Petition for rehearing was filed June 24, and the following *per curiam* order thereon, July 5th:

> After careful examination of the petition herein, we have failed to discover where any material question of law or of fact has been overlooked.

It is, therefore, ordered, that the petition be dismissed, and the order staying the remittitur heretofore granted be revoked.